UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

    SPIECH FARMS, LLC,

        Debtor.
_____/

PRODUCE PAY, INC.,                            Case No. 1:18-cv-1366

    Appellant,                               HON. JANET T. NEFF

v.

SPIECH FARMS, LLC,

    Appellee.
_____/

## OPINION

       This is an appeal from a bankruptcy proceeding in the Western District of Michigan. Appellant Produce Pay, Inc. ("PP") appeals a decision by the bankruptcy court denying its claim for protection under the Perishable Agricultural Commodities Act (PACA), 7 U.S.C. § 499a *et seq*. PP sought to exempt certain funds held by the debtor from the bankruptcy estate, under 11 U.S.C. § 541(d). PP claims that those funds are protected by a PACA trust. The bankruptcy court denied the exemption and PP now appeals that decision. In addition, PP appeals the bankruptcy court's decision to allow the debtor to pay the fees of its attorneys and advisors. For the reasons herein, PP's appeal will be denied and the decisions of the bankruptcy court will be affirmed.

### I. Background

Debtor-Appellee Spiech Farms, LLC is a grower and processor of blueberries, asparagus, and grapes. Before filing for bankruptcy, it relied upon Chemical Bank to finance its operations. Spiech mortgaged substantially all of its assets to Chemical Bank in exchange for loans and a line of credit. Spiech fell on hard times in early 2017 when frost destroyed a significant portion of its blueberry crop. In an attempt to shore up its financial state, Spiech entered into a "Distribution Agreement" with PP, which billed itself as a "multi-service finance company" that could provide "access to cash flow . . . the day after you ship your produce to the U.S." (Op. re PACA Claim of Produce Pay, Inc. (Bankr. W.D. Mich. Oct. 18, 2018), ECF No 6-39, PageID.3037.)

The terms of the agreement between Spiech and PP are somewhat opaque, but the nuts and bolts are fairly straightforward. The parties agreed that Spiech would notify PP that it has a pallet of produce for sale by registering that pallet on PP's software platform. PP could then purchase the pallet of produce from Spiech for half the market price. In connection with that purchase, Spiech would assign "all right, title and interest" in the produce to PP, but Spiech would keep the produce in its possession. (Distribution Agreement § 3.2, ECF No. 6-3, PageID.232.) Spiech would then sell, or attempt to sell, that produce to a grocery store or other customer. Whether Spiech sold the produce or not, it was obligated to repay the money it received from PP, plus a commission, within 30 days after receipt. After 30 days, the commission rate increased. After 60 days, Spiech had to "repurchase" the produce from PP by repaying the purchase price to PP, plus a commission. (*Id.* § 6.4, PageID.237.) In effect, the agreement allowed Spiech to obtain short-term loans from PP as a partial advance on payments that Spiech expected to receive from its existing customers. Also, by listing its produce on PP's software platform, Spiech could potentially reach new customers. If Spiech sold the produce to a customer introduced by PP, then PP would receive a higher commission.

PP was not deterred by the fact that Spiech had mortgaged its assets, including its produce and accounts receivable, to Chemical Bank. PP apparently expected that its share of the proceeds from the produce would be protected by a PACA trust, with rights superior to those held by Chemical Bank. By taking ownership of the produce before the sale to Spiech's customer, PP could position itself as an "unpaid supplier [or] seller" of a perishable agricultural commodity, with all the rights of a beneficiary to a trust created under 7 U.S.C. § 499e(c). It did not work out that way in practice, however, because PP never acquired ownership of the produce sold by Spiech. Each time that Spiech notified PP of a pallet of produce for sale, Spiech had already sold that pallet and delivered it to a customer.[1] Under state law, U.C.C. §§ 2-401 and 2-501,[2] title to the produce transferred to the customer upon delivery. Spiech could not give PP any rights in the produce that Spiech did not have at the time. Consequently, PP could not sell or supply produce that it never owned or possessed.

The agreement between Spiech and PP did not do much to help Spiech financially. In fact, it may have made things worse. Around the time that PP began disbursing money to Spiech in early September 2017, Chemical Bank discovered that PP had filed a financing statement against Spiech's produce and the proceeds therefrom. Chemical Bank expressed concerns to Spiech about that statement, because it suggested a possible violation of the loan agreement between Spiech and Chemical Bank. The loan agreement prohibited Spiech from granting additional security interests in its property to other entities. The following month, Spiech told Chemical Bank that PP might be entitled to protection under PACA. Chemical Bank believed that PP was attempting to

---

[1] Spiech did not hide this fact from PP. The pallet reports that Spiech uploaded to PP identified the dates that Spiech delivered each pallet to a customer. (*See, e.g.*, Pallet Shipments, ECF No. 6-3, PageID.250.)

[2] Codified in Del. Code tit. 6, §§ 2-104, 2-105.

circumvent the bank's security interests in Spiech's property. Chemical Bank declared Spiech to be in default and removed money from Spiech's deposit account in November.

Meanwhile, the relationship between Spiech and PP deteriorated. In October, Spiech began falling behind on its payments to PP. By November, Spiech lacked the funds to repay PP, due in part to its default under the loan agreement with Chemical Bank, and was unable to continue operations. On November 22, 2017, Spiech filed a petition for bankruptcy relief in the Western District of Michigan under Chapter 11 of the Bankruptcy Code.

In the proceedings before the bankruptcy court, PP asserted a PACA claim against the bankruptcy estate in the amount of $1,002,273.70, to recover the unpaid cash advances that PP made to Spiech. The bankruptcy court held an evidentiary hearing on the claim in September 2018. After the hearing, the court denied PP's claim in an opinion issued on October 18, 2018. It also denied PP's motion for reconsideration in an order entered on November 20, 2018. The denial of that claim is under review by this Court.

Apparently, PP also challenges the bankruptcy court's decision to allow Spiech to pay the fees of its attorneys and its financial advisor. PP objected that paying these fees would dissipate the assets in the PACA trust. The bankruptcy court overruled this objection because PP did not have a valid PACA claim. On appeal, PP acknowledges that its challenge to the payment of professional fees depends upon the success of its PACA claim.

**II.     Standard of Review**

The bankruptcy court's conclusions of law are reviewed *de novo*. *Pierce v. Underwood*, 487 U.S. 552, 558 (1988); *Rowell v. Chase Manhattan Auto. Fin. Corp. (In re Rowell)*, 359 F. Supp. 2d 645, 647 (W.D. Mich. 2004). Issues of statutory interpretation are questions of law, and are thus subject to review *de novo*. *ITT Indus. v. BorgWarner, Inc.*, 506 F.3d 452, 457 (6th Cir.

2007). The bankruptcy court's findings of fact are reviewed under a "clearly erroneous" standard. *Inv'rs Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 88 (6th Cir. 1993).

### III. PACA

PP seeks the benefit of a PACA trust. In PACA, Congress recognized that certain financing arrangements with buyers of perishable agricultural commodities can create a "burden on commerce in perishable agricultural commodities" and are "contrary to the public interest." 7 U.S.C. § 499e(c)(1).

According to the legislative history of PACA,

> Sellers of agricultural commodities are often located thousands of miles from their customers. Sales transactions must be made quickly or they are not made at all . . . . Under such conditions, it is often difficult to make credit checks, conditional sales agreements, and take other traditional safeguards.
>
> . . . .
>
> Many [buyers], in the ordinary course of their business transactions, operate on bank loans secured by [their] inventories, proceeds or assigned receivables from sales of perishable agricultural commodities, giving the lender a secured position in the case of insolvency. Under present law, sellers of fresh fruits and vegetables are unsecured creditors and receive little protection in any suit for recovery of damages where a buyer failed to make payment as required by the contract.

*Sanzone-Palmisano Co. v. M. Seaman Enters.*, 986 F.2d 1010, 1012 (6th Cir. 1993) (quoting H.R. Rep. No. 98-543, 98th Cong., 1st Sess. 3 (1983)).

Congress amended PACA in 1984 to give sellers of produce more protection by making the "produce buyer's unpaid obligation . . . 'a trust obligation . . . , prior to and superior to any lien or security interest in inventory held by the [buyer's] secured lender.'" *Id.* (quoting *In re Prange Foods, Corp.*, 63 B.R. 211, 214 (Bankr. W.D. Mich. 1986)). Specifically, 7 U.S.C. § 499e(c)(2) states, in relevant part:

> Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from

5

> perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents. . . .

7 U.S.C. § 499e(c)(2).

### IV. Bankruptcy Court's Decision

The bankruptcy court denied PP's PACA claim because PP was not a "seller" or "supplier" of perishable agricultural commodities under 7 U.S.C. § 499e(c)(2). PP did not sell or supply Spiech's produce because it never possessed the produce or acquired title to it. Under U.C.C. § 2-501, Spiech could not have assigned title in any produce to PP before identifying that produce in the pallet reports uploaded to PP. By the time that Spiech identified its produce for PP, Spiech had already sold that produce and delivered it to a customer. Under U.C.C. § 2-401, title to goods passes to the customer upon physical delivery to the customer.[3] Thus, Spiech relinquished ownership of the produce before it assigned any rights to PP. PP could not acquire that which Spiech could not give. Moreover, PP never possessed the produce or had any role in its sale. Its only role was to provide loans to Spiech after the sales occurred. PACA does not protect lenders like PP, who have no involvement in the sale or supply of produce.

The bankruptcy court also concluded that, to the extent Spiech retained an equitable interest in payment for the produce, it did not transfer that interest to PP. A PACA trust protects a produce seller's right to payment from its customers, i.e., its accounts receivable. However, PP's

---

[3] Similarly, the agreement between Spiech and PP contemplated that "Title to the Produce will remain with [PP] *until such Produce has been sold . . . and . . . has been accepted by the applicable grocer, other retailer or other purchaser.*" (Distribution Agreement ¶ 3.2 (emphasis added).)

6

agreement with Spiech did not expressly or impliedly assign Spiech's accounts receivable.[4] Applying a "transfer-of-risk" test to determine the "true" nature of the agreement between PP and Spiech, the court determined that the agreement was a financing arrangement, not a true sale of accounts receivable. (Op. re PACA Claim, ECF No. 6-39, PageID.3054.) A purchaser of accounts receivable assumes the risk that the seller's accounts will not be paid; however, PP's agreement put all the risk on Spiech for the failure of its customers to pay their invoices. Indeed, the agreement required Spiech to repurchase the produce from PP after 60 days, if Spiech did not repay the amount received from PP. Thus, the parties clearly did not intend for PP to shoulder the burden of recovering payment from a delinquent purchaser of produce, through a PACA trust or otherwise. Accordingly, PP did not acquire any rights that would allow it to assert a PACA claim.

V. **Analysis**

A. **The bankruptcy court properly denied PP's PACA claim.**

1. <u>PACA does not preempt state law regarding transfer of title to produce and accounts receivable.</u>

PP contends that the bankruptcy court improperly relied upon state law that is inconsistent with PACA. PACA provides that it does "not abrogate nor nullify any other statute, whether State or Federal, dealing with the same subjects of this chapter[.]" 7 U.S.C. § 499o. PACA preempts state law only insofar as it is "inconsistent" with or "repugnant" to PACA. *Id.* The bankruptcy court relied on state law to determine when title to Spiech's produce passed to the buyer, and to

---

[4] To be sure, the agreement recognized that PP would have the right to its portion of the proceeds after Spiech assigned the produce to PP. (*See* Distribution Agreement § 3.2 ("[U]pon such conveyance [of title in the produce to PP], [PP] shall then have all rights and title to such [produce], including, without limitation, all rights to [PP's portion] of the Gross Sale Proceeds, subject to the terms of this Agreement.").) However, the agreement did not assign Spiech's right to recover those proceeds from the buyer, or any other right protected by PACA.

7

determine whether the agreement between PP and Spiech transferred Spiech's accounts receivable to PP.

There is no inconsistency between the state law relied upon by the bankruptcy court and PACA. The bankruptcy court rightly observed that PACA does not displace state law regarding the passage of title in perishable agricultural commodities or in receivables. PACA is silent on these matters. Moreover, the state law discussed by the bankruptcy court is not inconsistent with, or "repugnant" to, PACA's purposes. PP's arguments to the contrary essentially assume that PP is a beneficiary to a PACA trust and then conclude that any law leading to a different result is inconsistent with PACA. As indicated by the bankruptcy court, however, PACA creates a trust for the benefit of unpaid sellers and suppliers of produce. It does not create a trust for the benefit of entities like PP, who loan money to a seller of produce and expect repayment from the seller. PP does not explain how it fits within any logical definition of "seller," "supplier," or "agent" in 7 U.S.C. § 499e. Accordingly, denying PP the benefit of a PACA trust is not inconsistent with PACA.

PP faults the bankruptcy court for citing *Six L's Packing Co. v. Beale*, 524 F. App'x 148 (6th Cir. 2013), and *Stowers v. Mahon (In re Samuels & Co.)*, 526 F.2d 1238 (5th Cir. 1976), but those citations are not critical to the bankruptcy court's analysis. *Six L's* supports the bankruptcy court's unobjectionable conclusion that state law supplies the relevant standard where PACA is silent. *See Six L's*, 524 F. App'x at 154 n.5 ("The Uniform Commercial Code ('UCC') applies to sales of produce under PACA, where PACA is silent as to a material part of the transaction at issue."). Other courts have made the same point. *See, e.g.*, *S & S Packing, Inc. v. Spring Lake Ratite Ranch, Inc.*, 702 F. App'x 874, 878 (11th Cir. 2017) ("PACA has some substantive

requirements, but it does not constitute a complete body of law. Accordingly, when PACA is silent on a matter, state law provides the rule of decision.").

Similarly, *In re Samuel & Co.*, one of several cases in a string of citations by the bankruptcy court, merely affirms the straightforward principle that, under the UCC, title to goods passes to the buyer upon delivery, and what the seller retains after that point is a security interest in payment. *See In re Samuels & Co.*, 526 F.2d at 1246. PACA gives this security interest priority over other security interests in the produce buyer's assets, but PACA does not alter the effect of delivery of goods on the passage of title to the buyer. Accordingly, PP's objection is meritless.

2. <u>Lenders like PP are not protected by PACA.</u>

PP contends that advancing money to produce growers is consistent with PACA because it "speeds payment to the PACA-Protected Debtor/Grower." (PP's Br. on App. 25, ECF No. 8, PageID.3333.) That may be true, but PACA does not apply to all transactions that benefit produce growers. It provides a specific remedy to a specific problem faced by unpaid *sellers* of produce attempting to recover proceeds *from buyers*. It does not provide protection for all lenders who support the produce-growing industry.

It is true that PP is not the type of lender identified in 7 U.S.C. § 499e(c)(1). It did not loan money to, and encumber the property of, a delinquent *buyer* of agricultural produce, and thereby make it more difficult for the produce seller to recover from the buyer. Nevertheless, it does not follow that PP's lending arrangement entitles it to the benefits of a PACA trust.

3. <u>PP did not acquire Spiech's rights as a PACA trust beneficiary.</u>

PP asserts that it stands in the shoes of Spiech as a beneficiary to a PACA trust because Spiech retained "equitable title" to its produce after selling it, and then PP acquired that title from Spiech. *See Kingdom Fresh Produce v. Bear County (In re Delta Produce, LP)*, 521 B.R. 576

9

(W.D. Tex. 2014) ("Because trust principles apply and the debtor[-buyer of produce] only holds legal—not equitable—title, if the debtor files for bankruptcy, the PACA trust assets are excluded from the bankruptcy estate."); *see also C.H. Robinson Co. v. Alanco Corp.*, 239 F.3d 483, 487 (2d Cir. 2001) ("[A] PACA trustee holds legal title to PACA trust assets but the seller retains an equitable interest in the trust assets pending full payment, so that the Bankruptcy Code excludes PACA trust assets from the PACA trustee's bankruptcy estate."). PP argues that the bankruptcy court failed to consider that Spiech transferred its PACA trust rights to PP when assigning its interests in the produce.

This Court discerns no error in the bankruptcy court's decision. The "equitable" interest retained by Spiech was an interest in receiving payment from the buyer, otherwise known as a receivable. The bankruptcy court properly determined that Spiech did not transfer its receivables, or any other interest protected by a PACA trust, to PP.

It is true that, when making this determination, the bankruptcy court employed a "transfer-of-risk" test that has been used in circumstances that are different from the instant case. In the cases cited by the bankruptcy court, courts applied this test to determine whether the *buyer* of agricultural commodities breached its duties as a PACA trustee when entering into what was either a lending arrangement or a sale of the buyer's rights in its own receivables. *See, e.g.*, *S & H Packing & Sales Co. v. Tanimura Distrib., Inc.*, 883 F.3d 797 (9th Cir. 2018); *Nickey Gregory Co. v. AgriCap, LLC*, 597 F.3d 591 (4th Cir. 2010); *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410 (5th Cir. 2003); *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063 (2d Cir. 1995). But there is no reason why the same test should not apply to the agreement between Spiech and PP. Indeed, the UCC recognizes that it is not unusual for a commercial agreement to "blur" the distinction between a transaction "in which a receivable secures and an

obligation" and one in which "the receivable has been sold outright." Del. Code tit. 6, § 9-101, cmt. 4. This is one of those agreements. Although the circumstances of the aforementioned cases were different, the transfer-of-risk test performs the same basic function in those cases as it does in this one; it helps the court distinguish the true nature of the parties' agreement. It was not improper for the bankruptcy court to employ a widely-used test to ascertain whether the distribution agreement assigned Spiech's rights in its receivables.

In short, the Court is not persuaded that there is any error in the bankruptcy court's decision denying PP's PACA claim.

**B.  PP has not shown any error in the bankruptcy court's orders allowing payment of professional fees.**

As PP recognizes in its brief, its objection to payment of fees from the bankruptcy estate depends upon the success of its PACA claim. Because PP has not offered any valid basis for overturning the denial of its PACA claim, its objection to the payment of fees also fails.

## Conclusion

For the foregoing reasons, the bankruptcy court's opinion and orders will be affirmed. An order will enter consistent with this Opinion.


Dated: December 17, 2019                    /s/ Janet T. Neff
                                            JANET T. NEFF
                                            United States District Judge